IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-1053

| | |
|---|---|
| RODNEY CLARKE, | ) |
| Plaintiff, | ) **COMPLAINT** |
| v. | ) |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

Plaintiff Rodney Clarke (hereinafter "Plaintiff"), by and through undersigned counsel, hereby files this Complaint against Defendant United States of America ("Defendant").

## INTRODUCTION

1. This Complaint alleges a federal cause of action and is brought solely pursuant to Section 804(b) of the "Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics (PACT) Act," also known as the "Camp Lejeune Justice Act of 2022" (hereinafter "the Act").

2. Defendant United States of America, through its military branches the United States Navy and the United States Marine Corps, has owned and operated Camp Lejeune as a Marine Corps base since 1941.

3. For decades, the water at Camp Lejeune in North Carolina was contaminated with toxic chemicals, including industrial solvents trichloroethylene ("TCE") and perchloroethylene ("PCE"), known to cause cancer and a host of other chronic—often deadly—diseases and conditions. Hundreds of thousands of servicemembers and civilians drank, bathed in, cooked with, and swam in that water. Federal government officials failed to ensure that toxic chemicals

1

from nearby industrial facilities, fuel tanks, and dry-cleaning operations did not seep into the water supply used by the men and women who were willing to lay their lives on the line for our nation and their families. In fact, for decades, the federal government did not even bother to test the water.

4. Thousands of Marines, sailors, civilian employees, and military family members who resided at Camp Lejeune between the 1950s and the 1980s have contracted serious diseases and chronic conditions as a result of their exposure to the contaminated water, including but not limited to: kidney cancer; Non-Hodgkin's lymphoma; multiple myeloma; leukemia; liver cancer; bladder cancer; chemically-induced parkinsonism; end-stage renal disease; systematic sclerosis/scleroderma; and cardiac defects. Camp Lejeune's toxic water has also been linked to widespread birth defects and high rates of stillborn babies.

5. When the truth about Camp Lejeune's water supply finally emerged in the late 2000s, the United States faced thousands of claims for compensation on behalf of the people injured or killed by its conduct. But instead of compensating servicemembers and others for their injuries, the United States steadfastly refused to pay their claims. When lawsuits were filed under the Federal Torts Claims Act ("FTCA") in federal court, the United States escaped liability by invoking North Carolina's ten-year statute of repose—which operated to bar all of the claims even though the federal government's misconduct had not come to light until well after the statutory period had run.

6. Now the United States has finally decided to fulfill its obligations to servicemembers, their families, and civilians who resided at the base during the period in which the water was contaminated.

## JURISDICTION AND VENUE

7. At all times relevant to the allegations contained in this Complaint, Defendant owned, controlled, and/or operated Camp Lejeune, which was and continues to be located on the eastern shore of North Carolina.

8. Defendant is liable under the Act. Section 804(b) of the Act establishes a cause of action permitting individuals who were harmed by the contaminated water at Camp Lejeune over the relevant period of time to obtain relief in this Court.

9. Specifically, "[a]n individual . . . who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." *Id*.

10. To meet the burden of proof, a plaintiff need only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is . . . sufficient to conclude that a causal relationship is at least as likely as not." Section 804(c)(2) of the Act.

11. The United States District Court for the Eastern District of North Carolina has exclusive jurisdiction over any action filed under Section 804(b) of the Act and is the exclusive venue for this action. *See* Section 804(d) of the Act. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331. Moreover, the amount in controversy exceeds $75,000, exclusive of interest and costs.

## THE PARTIES

12. Plaintiff Rodney Clarke is currently a resident of Kansas.

13. Plaintiff was born on December 20, 1945.

14. Between August 1, 1953, and December 31, 1987, Plaintiff resided, worked, or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

15. Specifically, Plaintiff was a member of the military who worked at Camp Lejeune from approximately March 1, 1967, through February 7, 1969.

16. Plaintiff was thereby exposed to the contaminants in the water at Camp Lejeune.

17. Defendant United States of America is the party responsible for damages caused by its military service components, including responsibility for the United States Navy and United States Marine Corps and related facilities. Defendant has waived its sovereign immunity from suit under Section 804(f) of the Act.

## **CONDITIONS PRECEDENT**

18. The Act "appl[ies] only to a claim arising before the date of enactment of this Act." The statute incorporates the FTCA's requirement that a claim must be presented to the relevant federal agency before the judicial action may proceed. *See* Section 804(h) of the Act (cross-referencing 28 U.S.C. § 2675). Under the applicable provision, if the federal agency fails to make a final disposition of a claim within six months of its filing, the claim is "deemed" denied, allowing the claimant to file an action in court. 28 U.S.C. § 2675(a).

19. All conditions precedent to the filing of this action and to Plaintiff's rights to the relief requested have occurred, been performed, or been excused.

## **FACTUAL BACKGROUND**

20. Established in 1941, Camp Lejeune has long served as a major training facility for the Marine Corps.

21. Camp Lejeune is in Onslow County, North Carolina, southeast of Jacksonville, and about 70 miles northeast of Wilmington, North Carolina. The base covers an area in southeastern North Carolina's Coastal Plain and is approximately 151,000 acres (233 square miles), with 14 miles of beach on the Atlantic Ocean.

22. Camp Lejeune has been densely populated throughout its history, with approximately 43,000 active-duty military personnel and 51,000 dependents as current occupants.

23. Historically, Camp Lejeune's drinking water was extracted from over 100 water supply wells, treated at eight treatment plants, and distributed to its residents through a network of water distribution system pipelines. The base housing areas were served by, among others, three main water supply and distribution systems that served the base: Hadnot Point (beginning in 1942); Tarawa Terrace (beginning in 1952); and Holcomb Boulevard (beginning in June 1972). Those systems consisted of a collection of wells, a water treatment plant, and a distribution system.

24. Beginning in the mid-1950s, toxic chemicals from various sources, including unlined landfills and leaking storage tanks, seeped into the soil and groundwater of Camp Lejeune and ultimately contaminated many of the wells used to supply the water treatment plants.

25. In 1979, the United States Environmental Protection Agency ("EPA") promulgated regulations governing drinking water under the Safe Drinking Water Act of 1974, 42 U.S.C. §§ 300f, *et seq*. ("SDWA").

26. In 1979, EPA's regulations included drinking water standards for Trihalomethanes ("THMs"), a by-product of drinking water disinfection, and suggested drinking water levels for TCE, a solvent often used for cleaning weapons and machinery.

27. In 1980, EPA published suggested drinking water levels for PCE, a solvent often used for dry cleaning.

28. To comply with EPA's regulations, the Camp Lejeune water utility began testing drinking water at the base.

29. Camp Lejeune first sampled drinking water to test for THMs. Other chemicals interfered with those results in 1980-1981.

30. During December 1980 through March 1981, Camp Lejeune water utility documents indicated "water highly contaminated with other chlorinated hydrocarbons (solvents)!"

31. In 1982, special tap water testing identified TCE and PCE as the chemicals interfering with the 1980-1981 results.

32. These drinking water samples confirmed that Camp Lejeune's Hadnot Point and Tarawa Terrace water treatment plants were distributing water that contained PCE, TCE, dichloroethylene, vinyl chloride, and benzene in quantities that were dangerous to the life, health, and welfare of who were exposed to it, including Plaintiff (or decedent).

33. Between 1982-1984, the Navy initiated an environmental cleanup program to identify potentially contaminated sites at Camp Lejeune for further investigation. As part of this effort, drinking water wells near potentially contaminated sites were tested.

34. In 1983, the federal government conducted an initial assessment of the potentially contaminated areas at Camp Lejeune.

35. From 1984-1985, the federal government began testing drinking water wells at Camp Lejeune. It was discovered that ten wells were contaminated and were removed from service.

36. During 1987-1989, SDWA was amended to include regulations for TCE, benzene, and vinyl chloride. SDWA regulations for PCE became enforceable in 1992.

37. On October 4, 1989, EPA added Camp Lejeune to its National Priorities List. Under

6

Case 7:23-cv-01053-M-RJ   Document 1   Filed 06/07/23   Page 6 of 16

the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, ("CERCLA"), commonly known as the Superfund Law, The Agency for Toxic Substances and Disease Registry ("ATSDR") was required to conduct a public health assessment of Camp Lejeune.

38. The ATSDR has estimated that in 1953, the Hadnot Point drinking water system was first affected by chemicals and the Tarawa Terrace drinking water system was first affected in approximately 1957.

39. ATSDR's 1997 Public Health Assessment ("PHA") found that people had been exposed to contaminants of concern in Camp Lejeune drinking water.

40. The current U.S. maximum contaminant levels ("MCLs") for TCE and PCE are 5 parts per billion ("ppb").

41. The MCLs for vinyl chloride and benzene are 2 ppb and 5 ppb, respectively.

42. The ATSDR used a data analysis and modeling approach to reconstruct historical contaminant concentrations.

43. The ATSDR historical reconstruction modeling of the drinking water contamination at Camp Lejeune indicated that vinyl chloride, benzene, TCE, and PCE levels above their current MCLs were present in the distribution systems since the 1950s.

**Hadnot Point Water Supply Area**

44. The Hadnot Point treatment plant provided drinking water to the main portion of the base at Camp Lejeune, including most of the barracks and workplaces.

45. The Hadnot Point Fuel Farm was built and installed in 1941 and was comprised of 15 fuel tanks. There was one 600,000-gallon above-ground tank, six underground 12,000-gallon tanks, and eight underground 15,000-gallon tanks. The underground tanks were placed at grade

and completely covered with soil. The above-ground tank stored diesel fuel while the other tanks stored gasoline, unleaded gasoline, and kerosene. It was discovered in 1979 that the Fuel Farm facilities had leaked an estimated 20,000-30,000 gallons of fuel into the ground and, more particularly, into the underground water aquifer.

46. Water from the Hadnot Point water treatment plant was contaminated primarily by TCE. Other contaminants in the drinking water included PCE and benzene and TCE degradation products t-1,2-dichloroethylene ("trans-1,2-DCE"), and vinyl chloride. Supply wells were contaminated by multiple sources: leaking underground storage tanks, industrial area spills, waste from an off-base dry-cleaning business, and waste disposal sites.

47. ATSDR modeled the contamination and estimated that at least one volatile organic compound ("VOC") exceeded its EPA maximum contaminant level in drinking water during August 1953 through January 1985.

48. In May 1982, the TCE level in the Handnot Point distribution system was as high as 1,400 ppb.

49. Vinyl chloride and benzene were also detected in the Hadnot Point distribution system during sampling conducted on or after December 1984.

50. In the Hadnot Point system, the median monthly estimated average concentrations from 1975 to January 1985 of TCE, PCE, vinyl chloride, and benzene were 366 ppb, 15 ppb, 22 ppb, and 5 ppb, respectively.

51. According to the ATSDR, a Marine in training at Camp Lejeune consumed an estimated 6 liters of water per day for three days per week and 3 liters per day the rest of the week. Under warm weather conditions, a Marine may consume between 1 and 2 quarts of water per hour and shower twice a day. Upon information and belief, the water supplied in the field came from

the Hadnot Point water system with both measured and estimated levels of TCE and PCE substantially higher than their MCLs.

**Tarawa Terrace Treatment Plant**

52. The Tarawa Terrace treatment plant provided drinking water to the Tarawa Terrace housing area at the base.

53. Samples of the water in Tarawa Terrace distribution system were tested by the government in May and July 1982, and February 1985 onward.

54. When testing was performed in or about February of 1985, the TCE in the water supply system was as high as 1148 ppb. The dichloroethylene level was as high as 406 ppb in the Berkley Manor Elementary School area of Camp Lejeune and the tetrachloroethylene was 215 ppb.

55. During the July 1982 distribution system sampling, PCE was measured as high as 104 ppb and reached a maximum of 215 ppb during the February 1985 sampling.

56. Historical reconstruction modeling of the drinking water contamination indicated that TCE and PCE levels above their current MCLs were likely present in the distribution systems since the 1950s.

57. ATSDR estimated that PCE concentrations exceeded the EPA maximum contaminant level in drinking water from the Tarawa Terrace water treatment plant for at least 346 months during November 1957-February 1987.

58. In the Tarawa Terrace system, the median monthly estimated average concentrations from 1975 to January 1985 of PCE, TCE, and vinyl chloride were 85 ppb, 4 ppb, and 6 ppb. The median number of months a Marine or Navy personnel was stationed at the base was 18 months.

9

**Holcomb Boulevard Water Supply Area**

59. The Hadnot Point water treatment plant supplied water to the Holcomb Boulevard area until June 1972, at which time the Holcomb Boulevard water treatment plant was constructed and began operating.

60. For individuals who lived within the Holcomb Boulevard area before 1972, the assessment of the health impact of exposure to chemicals in the drinking water is the same as individuals who lived in the Hadnot Point area or anyone who had used Hadnot Point as their primary water source during that time.

61. Intermittently, from 1972 to 1985, the Holcomb Boulevard area received contaminated Hadnot Point drinking water. During such periods, TCE was a contaminant of concern because it routinely exceeded its MCL.

**ATSDR Investigations**

62. In December 2012, the ATSDR released its "Analyses and Historical Reconstruction of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water Within the Service Areas of the Hadnot Point and Holcomb Boulevard Water Treatment Plant and Vicinities, U.S. Marine Corps Base Camp Lejeune, North Carolina - Chapter D: Occurrence of Selected Contaminates in Groundwater at Above-Ground and Underground Storage Tank Sites," which discusses the occurrence of specific contaminants in groundwater at above-ground and underground storage tanks at Camp Lejeune during the estimated period of water contamination from approximately 1957 to 1987. During that time, petroleum, oils, and lubricants ("POLs"), including gasoline, waste oil, diesel, heating oil, and jet fuel were stored in unmonitored, single-walled underground storage tanks. Over time, these underground storage tanks rusted and leaked, thereby contaminating surrounding groundwater.

63. Defendant did not release any of its findings that the Hadnot Point Fuel Farm was a source of contamination until December 2012. Prior to this time, very limited information regarding the source of contamination was provided to the public, including military members, their dependents, and other potential victims.

64. At all times relevant hereto, Defendant was required to maintain the Hadnot Point Fuel Farm and its water supply facilities at Camp Lejeune in a manner that was compliant, not only with due care, but also with all federal, state, and/or all applicable military regulations, orders, procedures, instructions, and standards to ensure there were no defects and/or leaks that would interfere with the health, safety, and welfare of individuals who were reasonably foreseeable to become exposed to the water supply systems.

65. For years, Defendant concealed the source of the contamination at Camp Lejeune. It was not until 2012 that Defendant released any information regarding the Hadnot Point Fuel Farm.

66. In 2017, ATSDR published its "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases." As part of its mandate, ATSDR completed several epidemiological studies to determine whether Marines, Navy personnel, and civilians residing and working on U.S. Marine Corps Base Camp Lejeune were at increased risk for certain health effects as a result of exposure to water contaminated with VOCs.

67. The 2017 ATSDR report concluded that a causal relationship exists between the following diseases and the contaminants in the Camp Lejeune water supply or a causal relationship is at least as likely as not: kidney cancer; non-Hodgkin's lymphoma; multiple myeloma; leukemia; liver cancer; bladder cancer; Parkinson's disease; end-stage renal disease; systematic sclerosis/scleroderma; cardiac defects, and potentially other conditions.

**Defendant's Failures to Warn and/or Act**

68. At no time did Defendant warn the individuals at the base or those coming onto the base who would be reasonably expected to use that water, that the water supply could and/or would potentially harm them and their families.

69. Historical records show that in the past, people living and working at Camp Lejeune were exposed to contaminated drinking water. As many as 1 million military and civilian staff and their families were exposed to the VOC-contaminated drinking water during this 30-plus year period.

70. However, during the early 1980s, base officials took relatively few drinking water samples to measure chemical contaminants at the base's water treatment plants.

71. One well supplying water to consumers at Camp Lejeune had 18,900 ppb of TCE, 400 ppb of PCE, 8,070 ppb of dichloroethylene, and 655 ppb of vinyl chloride.

72. Even after warnings to Defendant, one of the major sources of the contamination was concealed from people exposed to the water, including Plaintiff. Before 2012, Defendant publicly blamed a privately-owned dry cleaner, ABC One Hour Cleaners, for the release of contaminants at Camp Lejeune.

73. At all pertinent times Defendant, through its agents, servants and employees, acting within the course and scope of their employment, willfully, wantonly, and negligently failed to exercise due care by causing or allowing various pollutants and contaminants, such as TCE, as well as PCE, and refined petroleum products, such as benzene, toluene, ethylbenzene, and xylenes (collectively "BTEX") to leak and contaminate the base water supply in quantities that Defendant knew or should have known were dangerous to the life, health, and welfare of those exposed to the water, including Plaintiff.

74. Knowing or having reason to know that dangerous and/or hazardous chemicals were being released, Defendant had the duty to warn others, including Plaintiff, even if the specific harmful effects were uncertain or unknown.

75. The base command knew as early as 1979 that contaminants were possibly leaking into the water system, and of the potential health hazards to the persons expected to use the water supply, but concealed the contamination and the threat to human health and failed to take the necessary steps to warn, examine, survey, and protect those exposed the water system at Camp Lejeune, including Plaintiff.

76. At all times relevant, agents, servants, and/or employees of Defendant, acting within the course and scope of their employment, caused or permitted large quantities of contaminants to leach into the aquifers, without providing notice or warnings to consumers that they were being exposed to the dangerous and potentially poisonous substances.

77. At all times relevant, Defendant knew or should have known that the leakage was causing the water to be contaminated and would likely cause a variety of health problems, including but not limited to cancers, liver and kidney damage, autoimmune deficiencies, central nervous system disturbances, disfigurement, pain, suffering and possibly death to those exposed to the water system, including Plaintiff.

**The Camp Lejeune Justice Act of 2022**

78. On August 10, 2022, the President signed into law the Camp Lejeune Justice Act of 2022.

79. The purpose of the legislation is to, *inter alia*, supersede the judicial rulings that barred recovery under the FTCA for individuals injured by the contaminated water at Camp Lejeune.

80. Section 804(b) of the Act establishes a new federal cause of action specifically for those affected by the extensive contamination at Camp Lejeune. It provides that:

> an individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

81. The Act allows a plaintiff to obtain a recovery for a "latent disease." Section 804(e)(1).

82. To meet the burden of proof under the Act, a plaintiff must "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—

(A) sufficient to conclude that a causal relationship exists; or

(B) sufficient to conclude that a causal relationship is at least as likely as not."

Section 804(c)(2).

83. The Act includes its own statute of limitations and makes inapplicable any other statute of repose or statute of limitations. *See* § 804(j). The Act's statute of limitations provides that "[a] claim in an action under this section may not be commenced after the later of—

(A) the date that is 2 years after the date of enactment of this Act; or

(B) the date that is 180 days after the date on which the claim is denied under section 2675 of title 28, United States Code."

*Id.*

## COUNT ONE: CAMP LEJEUNE JUSTICE ACT

84. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

14

Case 7:23-cv-01053-M-RJ   Document 1   Filed 06/07/23   Page 14 of 16

85. Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953, and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

86. During this time, Plaintiff was exposed to water supplied by Defendant or its agents at Camp Lejeune.

87. The water supplied to Plaintiff by or on behalf of Defendant was polluted and contaminated as described herein with chemicals including but not limited to TCE, PCE, vinyl chloride, and benzene.

88. Subsequently, Plaintiff was diagnosed with brain cancer and fatty liver disease resulting in cirrhosis of the liver on a date before the enactment of the Act.

89. A causal relationship exists between Plaintiff's illnesses and the contaminants that the Plaintiff was exposed to in the Camp Lejeune water supply. The causal relationship is at least as likely as not.

## CLAIM FOR RELIEF

90. Plaintiff respectfully requests that, pursuant to Section 804 of the Act, the Court enter judgment against the United States and award damages and all other appropriate relief for the harm to Plaintiff that was caused by exposure to the water at Camp Lejeune.

## JURY TRIAL DEMAND

91. Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 804 of the Act.

Dated: June 7, 2023					Respectfully submitted,

BOULWARE LAW LLC

*/s/ Brandon J.B. Boulware*
Brandon J.B. Boulware		MO # 54150
Jeremy M. Suhr			MO # 60075
Erin D. Lawrence			MO # 63021
1600 Genessee, Suite 416
Kansas City, MO 64102
Tele: (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com
erin@boulware-law.com
*Attorneys for Plaintiff*
*Pro Hac Vice motion forthcoming*


MILLER MONROE & PLYLER, PLLC

*/s/ Jeffrey R. Monroe*
Jeffrey R. Monroe
North Carolina State Bar No. 39930
1520 Glenwood Avenue
Raleigh, NC 27608
Telephone: (919) 809-7346
Facsimile: (919) 516-0062
Email: jmonroe@millermonroe.com
*Local Civil Rule 83.1(d) Counsel for Plaintiff*